May I please report? I would like to address three of the errors that the board made in this case. One pertains to the construction of the remission phrase. The second pertains to the board's finding of obviousness with respect to the without food limitation. And the second pertains to the board's considerations of or analysis of the secondary considerations of non-obviousness as it pertains to the long-felt need issue. First, I want to start with the board's construction of the remission phrase. Namely, remission is defined as a DAI score of 0 or 1. Let me ask you about the obviousness issue first, though, if you don't mind. Sure. Don't the press release and the EndoNurse reference pretty much show the invention and that it's successful? The press release and the EndoNurse show the method of maintaining remission with the once daily administration of the misalignment formulation. But what the press release and EndoNurse do not show is A, how remission is defined, and B, the without food limitation. Well, you've got another reference which discloses without food. This is an obviousness rejection, not anticipation, right? That is correct, Your Honor. What the board did and what the petitioner argued was the board took the methods of the press release and EndoNurse, combined them with Marikowski and Bruner, one of which was a comparative clinical study, and the other of which was a gastrointestinal transit time study with gamma scintigraphy. And then recognized that they had to bridge the gap between those two, those references, because neither of them actually were sufficient to show a reasonable expectation of success for achieving the claim method of maintaining remission without food. And the reason for that is because of the significant evidence of unpredictability which Falk submitted and the board summarily dismissed by finding that the claims did not require a food effect. That is true, to be sure. We don't dispute that. But what we do dispute is the fact that because of the considerable unpredictability in the art about the impact of food on colonic bioavailability, that therefore, to establish a reasonable expectation of success, one has to have something more than the press release and EndoNurse in combination with Marikowski and Bruner. And both the petitioner and the board recognized that. And what did they turn to? And before I go to that, just for the record, the evidence of unpredictability is set forth in detail in our blue brief at pages 41 to 42 and in our gray brief at page 15. So what did they do? They went to Davis to fill the gap, Davis 1985, which is an academic paper. And the problem with where they erred there is they misunderstood the teachings of Davis. And the board relied on two separate paragraphs from Davis 1985, and that's found in Appendix 40. Both of those paragraphs are talking about A, gastric emptying in a fasted state, and transit time. And let's be clear, what Davis was looking at was delivery systems intended to release the active ingredient in the small intestines, where systemic bioavailability is important. With mesalamine formulations, which are intended to target the colon and act locally on the inflamed mucosa of the colon, what's important is colonic bioavailability. So that's different. But going back to what Davis taught, Davis taught that delivery systems in a fasted state had lower systemic bioavailability. And that's because they could, they emptied the stomach fast, and they passed through the small intestine fast, and they could sometimes reach the colon in three hours. Therefore, they weren't getting enough to be absorbed systemically, which is where you would want those drugs to be absorbed. And then the board took a leap of faith from that and said, okay, we're the opposite of that. We want to reach the colon. So if we want higher colonic bioavailability, then we want to do it in a fasted state. And then they used that to leap to the fact that Davis taught you without food. The problem with that entire analysis is that transit time and gastric emptying are simply irrelevant to the formulations that are disclosed in the press release in Maracusti and Bruner. And why is that? Because they have a pH-dependent coding, a pH-dependent coding which is intended to prevent the release of the drug in the stomach, prevent the release of the drug in the small intestine, and allow release of the drug when it reaches the terminal ileum and cold. So that's why transit time, gastric emptying, everything that's taught by Davis is completely irrelevant to the without food limitation. And quite frankly, that takes us back to, well, why is there a need for a food effect study? There's a need for a food effect study to be able to determine whether you have the right amount and type of enteric coding on your drug so that it doesn't release prematurely with food and that at least if you give it with food or without food, you have the same colonic bioavailability, if not better. So that's the without food limitation. And we believe the board erred for those reasons because it misunderstood the Davis reference. Turning back to the claim construction issue, remission is defined as a DAI score of 0 or 1. False construction was that construction should be a sum of two subscores with a rectal bleeding score of 0 and a mucosal appearance score of 0 or 1. It's a binary system. As opposed to the four subscores that are used for the generic description of the revised Sutherland Disease Activity Index. This, the intrinsic evidence, is clearly in support of this construction. And this court's precedent is clear that under the broadest reasonable interpretation standard, the construction cannot be divorced from the specification and it must correspond with what and how the inventor describes his invention. While the plain language of the claim explicitly states that remission is defined as a DAI of 1 or 0, it does not define the phrase DAI score of 0 or 1, nor does it explain how you calculate it. That's why you need to resort to the specification. The board relies on a general description of DAI in column 17 that makes absolutely no reference to remission whatsoever and ignored the express and repeated lexicographer definition in the specification. Remission, the patentee here acted as his own lexicographer. He repeatedly and consistently defined remission based on two subscores. We have all of those sites in our blue brief at pages 30 to 32. Was there a definition of the DAI score itself? There is a definition of the general DAI score in the patent. As a lexicographer? That's not for remission. Not for remission. The lexicographer comes in where you say, well, what does DAI of 0 or 1 mean in the context of remission as this patentee used that term? There's a piece of art that the board relied on for its obviousness determination. It's the CUNY article. Back to remission. Sure. You would agree that that's defined in the plain language of the claim? I would agree that it states remission is defined as a DAI of 0 or 1, but that begs the question, what does DAI of 0 or 1 mean? How do you calculate it? What subscores do you use and which are the 0 and which are the 1? The generalized DAI scoring system, so to speak, has four subscores. So you need to know what are the subscores that you are using. So it's a question of the four subscores versus two subscores. And what the 0 or 1 means. The standard that the board applies is the broadest reasonable interpretation. Understood. Why wouldn't that be the four scores then? No, I don't believe so. I don't think one could say that one is broader or narrower. I mean, one could actually argue that using the two subscores, the scope of the claim may be broader because more people would maintain remission because once you add additional subscores, there's more likelihood that somebody could fall out. You understand what I'm saying? So I don't think you can say one is broader or one is narrow in any sense. But even leaving that aside, under broadest reasonable interpretation, you must read that in light of the specification. And you must read it in light of how the patentee used that term and described it in terms of this invention. And going back to what Cooney described, Cooney described the fact that there were 13 different disease activity indexes. And even under DAI, if you use various different scoring systems, you got widely variable results. So you needed to define remission and how you were calculating it and what the subscores were that you wanted. And that's what Cooney teaches. So the board erred in its construction of DAI and there was no finding of obviousness based on false construction, the two subscores. And there's no substantial evidence in the record to support a finding of obviousness under false construction. So this court should reverse, or at the very minimum, remand under the proper claim construction. I'm getting into my rebuttal time, so I will rest for now. Thank you. We will save it for you, Ms. Burke. Thank you. Mr. Florence. Good morning, Your Honors. May it please the court, I'd like to talk a little bit about what the board actually did when they looked at the DAI limitation. And the board, in fact, did look at the intrinsic evidence and found that the construction that they came up with, that remission is defined as a DAI score of 0 or 1, actually means the use of the sum of all four subscores, was, in fact, supported not only by the claims, but by the specification itself. And so let's look a little bit at what the board actually did. Again, as Ms. Burke pointed out, the board did apply the Broadness Reasonable Interpretation Standard, as it must, for these proceedings. And the board started, as it should, with the language of the claims itself. And the board found that the phrase, remission is defined as a DAI score of 0 or 1, was in itself an express definition of remission. And although the board did look at the specification and find that there were instances where the construction that's put forth by the patent owners, there are instances where remission is used as a sum of only two subscores, but every place that it's used in the specification as a sum of two scores, it uses the term revised DAI. It does not use the broader term DAI. And Ms. Burke stated that the section of the specification that the board relied on to define DAI as four subscores, that that section of the specification does not mention remission at all. That's entirely inaccurate. That's not true. If you look at the section that the board looked at, that was from example five, and that's located in the patent itself at column 17. And that example is entitled Studies on Remission from Ulcerative Colitis. And it begins that studies were conducted in 562 adult subjects in remission from ulcerative colitis. And then it goes on to explain that disease activity was assessed using a DAI that uses the sum of all four subscores. So the board did find that when the specification is referring to DAI, even in the case of remission here, that it does, when it's not using the narrow term revised DAI, it is in fact referring to all four subscores. And the board also, as your honor, Judge Lurie pointed out at the beginning of the argument, that doesn't the Salix press release and EndoNurse, don't they define what the invention is. What they do say is they say they don't give the measurement, as Ms. Bork pointed out, they don't give the measurement of how DAI was measured. But they do say that the patients were relapse free for six months. And all of the experts in the case testified that relapse free essentially means being in remission. And so the question that the board looked at and asked is what does a person who is still in the yard think of when they see the word relapse free in those press releases. Of course the press release talked about one dose per day, right, rather than four? That's correct. That's correct, it did, your honor. And in fact the press release said that under that dose it was successful in obtaining remission essentially for six months of treatment. But what the, in addition to looking at the intrinsic evidence, the board also looked at the intrinsic evidence and carefully weighted both of the petitioner's expert, Dr. Degenes, and also Dr. Softy, the patent owner's expert. And what the board noted about that was that Dr. Degenes looked at the background art, specifically the Meyerhof reference, taught that within that reference itself it provides a customary marker that's used in clinical practice for determining remission. And it stated that remission would be defined as, it says a patient is considered to be in remission for ulcerative colitis if an ulcerative colitis, DAI, score of less than or zero one is obtained. And it gives the sum of all those sub-scores. So a person of ordinary skill in the yard reading the 2007 press release and seeing the word relapse-free would know that it's customary to use a DAI of all four sub-scores in the art when determining remission. Now, Ms. Burke mentioned the CUNY reference, so I would like to touch on it. The CUNY reference does provide information regarding the different indices that are available to IPOSA as well. But as the board pointed out, the board found that CUNY actually teaches toward using a DAI of four sub-scores rather than two because CUNY, one, teaches that the DAI is currently favored by the Food and Drug Administration for trial design in ulcerative colitis, and it's one of the most widely used of the activity indices in clinical trials. The board also found that contrary to patent owner's argument, CUNY would have led IPOSA to define remission as a DAI score of zero or one where the score is, in fact, based on all four sub-scores because CUNY discloses three different remission endpoints. It disclosed zero, less than or equal to one, or less than or equal to two. And this is key. The board cited Dr. Softe's own testimony that each of these endpoints disclosed in CUNY for remission are based on the full DAI score, so the sum of all four scores. And the board concluded that if CUNY would have had a reason to use any one of these three numerical definitions of remission in the method described in the September 2000 press release in EndoNurse, it would have been obvious. So the board didn't disregard any of the evidence put forth by Dr. Softe, and in fact found that CUNY actually teaches toward finding a DAI. One thing that I wanted to touch on just briefly was that there is evidence in the record that was before the board that would indicate that even under the patent owner's construction, that if that construction would have been adopted by the board, that it also would have been obvious. And that evidence was before the board in the petitioner's reply to the patent owner's response. And now to be sure, the board did not make a finding as to whether or not if they had applied the construction that had been put forth by the patent owners on DAI, the board did not make a finding if it would be obvious under their construction because the board found that it would be the sum of all four subscores under the DAI and found that was obvious. But the evidence is in fact there. But what the petitioners had argued was that the construction put forth by the patent owner was too broad because it's really directed at what's called registration remission. And registration remission, as Dr. Softe testified and is also disclosed in CUNY, is based on only the two same subscores that the patent owner advocates for for their definition. The rectal bleeding score and the mucosal score. And it excludes the more objective subscores of stool frequency for the overall assessment. But CUNY does provide that exact same definition within it. And Dr. Softe testified in his declaration when he was advocating for that position that that's exactly why he uses it in his own practice. In his own practice, he uses registration remission to determine remission because it gets rid of the subjective subscores. It gets rid of stool frequency because that can be subjective and the global overall assessment can vary from physician to physician. So he doesn't use those. So there is evidence in the record that that was commonly in use. Dr. Softe himself uses it. But CUNY does say that registration remission itself is most favored by the FDA for Phase III clinical trials. What is the 2007 press release? It says it's the results of a Phase III clinical trial. And so, even though the board didn't go there, they could have. But our position is essentially that the claim does require the sum of all four DAI scores because it's plain on its face. The definition within the claim does not include the statement revised DAI. It just broadly says DAI. And under the broadest reasonable interpretation, that's where the board went and that's where they probably need to go by the teachings of the intrinsic evidence and also the extrinsic evidence as well. So what I would like to do now, if there are no questions related to DAI, is I would like to address the food effect issue that's also raised by Ms. Bork and the patent owner. Now Ms. Bork had stated that the board really had to bridge the gap between Marikowski and Bruner but summarily demissed evidence in the art regarding predictability with food. That's not quite accurate. And the teachings of Davis 1985, it teaches something a little bit broader. So Ms. Bork only stressed the fact that Davis 1985 teaches that the pellet formulations are delayed in the stomach and that the transit times talked about in Davis 1985 relate to systemic bioavailability but as the board correctly pointed out, Davis 1985 in itself states, there's a whole section on position drug release and it states that sometimes you don't want the drug to be released in the upper GI tract. You want it to be available to be administered locally and it uses ulcerative colitis and mesalamine as an example. What about Marikowski? Sure. Marikowski, Your Honor, relates to a study between a granulated mesalamine formulation and a tablet formulation and the overall daily dose was 1.5 grams, the same dose from the 2007 press release. Now that dose, however, was given three times a day. It wasn't given as a once daily dose but the overall daily dose was the same and in Marikowski, the drug was administered three times a day without food. It was given an hour before meals each time and what Marikowski teaches and what the board found is that Marikowski teaches that the treatment was in fact shown to be effective for inducing remission. So it was an eight week study. It wasn't six months like the study in the 2007 press release but it was eight weeks and it showed that the granulated mesalamine formulation was equally effective at inducing remission as the tablet formulation was and so the board concluded from that that one, there doesn't need to be a food effect study. The board started with the premise that the claims don't require a food effect study, it doesn't relate to the claims but even if they did, Marikowski shows that for eight weeks, a 1.5 gram daily dose is effective for a granulated mesalamine formulation of actually inducing remission and under the conditions where it's given without food. So yes, Marikowski does not show whether or not administering that same formulation with food versus without food would have been more or less efficacious but the claims don't require that. The claims... Well, the claims say without food. Well, that's right but the claims just say it has to be administered without food but Marikowski already did that. Marikowski already administered it without food. Now the Bruner reference which was also relied on as an alternative from the board, that reference too has some pertinent information that's available. Now that reference, they did not test for efficacy but what that reference was, it took a granulated mesalamine formulation and again a tablet formulation and through syndiographic studies, it measured, it followed the exact time and region of disintegration and the release of the active ingredient in the body and it showed that the granulated mesalamine in the tablets both reached the targeted area, the colon and released at approximately the same time frame. So even though it's not looking at efficacy, it is showing that a granulated mesalamine formulation can make it to the targeted area just as quickly and be available for release as the tablet formulation and Marikowski importantly was performed after an overnight fast so it too was given without food. Now one point I would like to just circle back to very quickly is Davis 1985 as I was stating talks about positional release of the drug in the case of ulcerative colitis and mesalamine but it also teaches that small particles, small pellets like this formulation, a granulated formulation that in the presence of food, they remain in your stomach. They don't pass on their own and the presence of food increases the pH to as high as 6 which would cause Salix 2007 press release the granulated mesalamine there, it would cause it to prematurely dose dump and Davis 1985 warned if you want positional release, you don't want dose dumping. So that teaching is there. Thank you counsel. We'll hear rebuttal from Ms. Brook. Just a little line. To follow up on the Davis reference, there are multiple sections of that reference. The section I was talking about is the one that's talking about the physiology of the gastrointestinal tract and transit time and gastric emptying which is what the board relied on. As I said, the board misunderstood that teaching. The board misunderstood that teaching the positioned release of the drug is later on in the article and actually supports us because what Davis says there is for 5-ASA formulations that you want to target the colon for. You actually use a pH dependent coding to delay the release to get to the colon. So that actually supports our position I would say. I would also note that the aspect of the pH dependent coding to optimize that to make certain that you don't have this premature release which my colleague referred to in the stomach with the rise of the pH from the food. That's why you do a food effect study. Make sure that the coding is thick enough and that you have the right type of polymer on there that will release at the right pH. Why would you need a food effect study that teaches that very same principle that food can elevate the pH in the stomach? Because of the unpredictability in the art with mesalamine formulations there are various formulations of mesalamine. Some tablets, some delayed tablets, some delayed and extended release and the data is all over the place about whether to administer it with food or without food. In fact during the prosecution there's a package insert called LiALDA which is a delayed and extended release mesalamine formulation which suggests that you should which instructs in the label that you administer it with food. So the unpredictability in the art requires you to go to the and Davis itself says it in his article is that you want a food effect study to actually measure these principles these theoretic principles of systemic delivery. Is that in reference to the efficacy of the coding of the of the drug itself? No, no, no. His reference to needing a food effect study is in the section about the physiology of the gastrointestinal tract which I talked about before. The transit time, the gastric emptying where he was saying that for drugs that are targeted for the small intestine sometimes in a fasted state it would go too fast and that section says nothing about drugs. So Davis teaches basically against dose dumping. Well that's a different concept. That's a different concept. That's where the the Enteric Code with monolithic tablets the Enteric Code falls off fast and the whole drug releases at one spot and that's not what you want. With the smaller so it disperses throughout the gastrointestinal tract. Let me just say something about the claim construction. The revised versus the modified. That's been a misunderstanding by the petitioners all along and I would refer the court to our gray brief in pages 8 through 9 where there was testimony that the revised DAI or the modified DAI they both mean the same thing. It refers to the friability from the mucosal appearance score not to having a DAI sub-score. Having a DAI with two sub-scores. And in fact in the generalized definition that the board went to in example 5 it calls it a modified Sutherland Disease Activity Index. That's the same as a revised Sutherland Disease Activity Index which is throughout the specification what is used to define remission. I don't feel like I need to go through every single site in the specification where remission was defined. But I will say it's not. You don't have time for that. I would just say it's not only in the examples. It is in the detailed description of the invention and it's repeated throughout. I would say with respect to Maripalsky let's be clear Maripalsky Your time for rebuttal is concluded but Judge Rainer has a question. Just very quickly if we affirm in this case and what happens to the SAILX appeal from the district court? If you affirm in this case well we still have additional appellate options with respect to what to do. You mean you could seek an in-bank or Exactly. Seek cert. Our recourse does not end immediately. Other than that it's moot. Yes. Thank you. We'll take this case under advisement and give you 30 seconds to change your papers for the next one.